UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHILDREN'S HOSPITAL CORP. D/B/A BOSTON CHILDREN'S HOSPITAL,<br><br>       Plaintiff,<br><br>vs.<br><br>ATTACHMATE CORP.,<br><br>       Defendant | Civ. A. No. _____ |

## COMPLAINT (JURY TRIAL DEMANDED)

### PRELIMINARY STATEMENT

1.      Boston Children's Hospital has been threatened with litigation if it does not pay over $900,000 to Attachmate, Corp., the successor-in-interest to a Seattle-based software company from which the Hospital purchased software end-user licenses primarily in the late 1990s and early 2000s. The software in question, Reflection, is a terminal emulator program that the Hospital has not used since 2006, but for which the Hospital purchased thousands of licenses covering various versions when it was in use. Attachmate's unreasonable demand is based on erroneous conclusions drawn from an audit that Attachmate undertook in 2014—nearly a decade after the Hospital stopped using the software. Attachmate billed the Hospital nearly a million dollars for this old software, including for 15 years of "accrued interest" at 12%, and threatened to litigate if it refused to pay.

2.      The Hospital's position is that it purchased licenses for the software it used; that it has neither infringed Attachmate's copyrights nor breached the terms of the license agreements; that any claim of breach of contract or copyright infringement is barred by the statute of limitations, not to mention other defenses of waiver, estoppel, and acquiescence; and that

Attachmate is liable to the Hospital on account of its unfair or deceptive acts or practices in trade or commerce. The Hospital seeks declaratory relief and damages.

JURISDICTION

3.      This action arises under the federal statute governing copyright infringement, 17 U.S.C. § 501.

4.      The plaintiff, Children's Hospital Corp. d/b/a Boston Children's Hospital, is a Massachusetts corporation with its principal place of business in Massachusetts. On information and belief, the defendant, Attachmate Corp., is a Washington corporation with its principal place of business in Washington. The amount in controversy, without interest and costs, exceeds the sum specified by 28 U.S.C. § 1332.

5.      The Court has jurisdiction under 28 U.S.C. § 1331, 1332(a)(1), and 1338(a). The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) of the Hospital's claims for a declaration that it did not breach any licensing agreement with Attachmate and that Attachmate violated G.L. c. 93A, § 11; those claims form part of the same case or controversy under Article III of the United States Constitution.

STATEMENT OF THE CLAIM

6.      Boston Children's Hospital is one of the world's leading pediatric medical and research centers. Located in Boston's Longwood Medical Area, with smaller facilities in Lexington, Peabody, and Waltham, the Hospital annually serves tens of thousands of children and is ranked first in the nation in many medical and surgical specialties.

A.      The Hospital's Need For Terminal Emulators.

7.      In the 1990s and before, the Hospital operated two clusters of what were then known as "mini-computers"—mid-sized computers more powerful than workstations but smaller than some mainframe computers. These clusters of computers ran on hardware using the VAX

2

architecture. One of the clusters functioned as servers for the Hospital's email service; the other functioned as servers for clinical data.

8.     In the early days of computing, a user would provide input to such servers and receive output from them via a terminal—a device that received text as input and displayed text as output.

9.     By the 1980s and 1990s, many businesses provided personal computers to their employees and wanted to allow them to send and receive data to and from their servers using their PCs rather than a dedicated terminal device. One method of doing this was by installing "terminal emulator" software on the PCs. The terminal emulator would allow the user to input text using her PC, which then would be transmitted to the server, and the server's output could then be displayed on her PC.

10.     Children's Hospital needed terminal emulators to run on the PCs used by Hospital employees, most of which ran on the Microsoft Windows operating system. When running on Windows or a similar operating system, the terminal emulator would open a familiar window on the desktop of the user's PC and provide remote access to the Hospital's e-mail and clinical servers.

B.     The Hospital Purchases Reflection Licenses From WRQ.

11.     In the late 1990s, the Hospital purchased licenses for terminal emulation software called "Reflection" from a Seattle firm known as WRQ.

12.     The Hospital purchased the software via a reseller, SHI International Corp., and not from WRQ directly.

13.     Although the Hospital does not have complete pricing data for the entire period over which it purchased licenses, it paid $143 per license during the height of its use of—and need for—terminal emulation software.

3

14.     WRQ published Reflection under various names and in various versions, and the Hospital purchased licenses according to its needs. For example, WRQ published (and the Hospital bought licenses for) "Reflection 2 Macintosh," "Reflection for Dos," "Reflection for IBM," "Reflection for Multi-Host Enterprise Standard Edition," "Reflection for Regis Graphics," "Reflection for UNIX," and "Reflection Suite for TCP." For each of these products, WRQ would publish updates and issue new releases under new version numbers. For example, the Hospital purchased licenses for Reflection for UNIX versions 5.20, 5.21, 6.00, 7.00, and 10.00.

15.     WRQ also sold Reflection for UNIX as part of a "suite product" called Reflection Multi-Host Enterprise Standard Edition. In addition to Reflection for UNIX, the "suite product" included, as components, Reflection for IBM and Reflection for Regis Graphics, among other products.

16.     On information and belief, Attachmate owns registered copyrights in multiple versions of Reflection for UNIX and Reflection for IBM. There is no record, however, of any registered copyright for the "suite product," Reflection for Multi-Host Enterprise Standard.

17.     From January 1997 through approximately September 2005, the Hospital purchased thousands of licenses from WRQ. Over that period, as the Hospital's needs changed along with the computing industry, the number of invoices reflecting transactions between the Hospital and WRQ (according to Attachmate's records) declined quickly and consistently:



18.     Before this action, Attachmate provided the Hospital with several license texts, including an "End User License Agreement For Reflection v. 8.0 Software" dated March 2000; a "WRQ End User License Agreement" that is undated;  and an "AttachmateWRQ Software License Agreement" dated June 2006.

19.     Given the passage of time and the fact that, as alleged more fully below, the relevant Reflection software has been useless to the Hospital for more than a decade, the Hospital is unable to determine which license text governed its purchase of Reflection software at particular times. Without admitting that any of these particular license agreements governed the use of any particular instance of the software, the three license agreements noted above are attached to this complaint as Exhibits 1, 2, and 3, respectively.

20.     In general, each of the license texts Attachmate has provided purports to require a separate license for each computer on which the Reflection software is used.

C.      <u>The Hospital Changes Its IT Infrastructure And Stops Using Reflection Software.</u>

21.     In or around 2004, the Hospital began using newer, more modern servers, and its employees stopped using the Reflection terminal emulator to access the older server clusters. IT

staff still occasionally accessed the older servers as needed, but, on information and belief, they did so only at the database level; they did not use the Reflection software.

22.     In 2006, the Hospital took the older server clusters out of service altogether. Since the only function the Reflection software then performed at the Hospital was to access those servers, it is beyond dispute that the Hospital has not used the software at issue since 2006, nor could it. (Although Attachmate's records also show four more recent invoices—two in 2010, one in 2012, and one in 2013—they apparently relate to licenses for a different product that is immaterial to the current dispute.)

D.     Years After The Hospital Stops Using The Software, Attachmate Conducts An Audit.

23.     In October 2014, years after the Hospital had decommissioned its old server clusters and stopped using Reflection to access them, Attachmate contacted the Hospital's IT staff and asked it to run a program provided by Attachmate on the Hospital's computer network. Attachmate purportedly wanted to audit the Hospital's compliance with the provisions of the license agreement limiting the number of copies of the software the Hospital could use on its computers.

24.     On information and belief, the program that Attachmate provided sought to determine whether files with certain filenames were present on the Hospital's computers, and whether the Windows registry on the Hospital's computers contained certain data that would indicate to Attachmate that the licensed software was present on the Hospital's computers. The "Windows registry" is a database used in the Windows operating system that stores configuration settings and options.

25.     The Hospital's IT staff executed Attachmate's program and provided the results to Attachmate.

26.     In March 2015, Attachmate demanded that the Hospital pay more than $925,000 for purportedly unlicensed copies of Reflection software it identified on the Hospital's computers. It apparently calculated this amount based on three factors: the number of software installations that it claimed exceeded the applicable number of licenses; the list price Attachmate claimed to charge for the software; and interest at 12%.

27.     Attachmate believed that most of the software in question had been installed approximately 15 years ago, so it included 15 years of interest at 12% on the bulk of its principal claim.

28.     Attachmate has demanded prompt payment and has threatened litigation if the Hospital does not accede to its demands.

E.     The Hospital's Deployments Were Licensed.

29.      Attachmate's own data strongly suggest that the Hospital's inactive and unused installations of Reflection software were authorized by the applicable license. For example, according to Attachmate, the Hospital had *no* licenses for Reflection for Multi-Host Enterprise Standard Edition version 8.0, but following its audit it claimed that 875 copies of the software were deployed on the Hospital's computers. On the other hand, the Hospital owned *thousands* of licenses for various versions of Reflection for UNIX and Reflection for Regis Graphics, both components of Reflection for Multi-Host Enterprise Standard Edition. But after the audit, Attachmate claimed that the Hospital had deployed only one copy of either licensed program on its computers.

30.     On information and belief, the Hospital obtained each version of the Reflection software found on its systems from WRQ, Attachmate, or its reseller in a legitimate commercial transaction in return for payment.

31.     According to Attachmate, however, the Hospital did not purchase even one license for version 8 of Reflection for Multi-Host Enterprise Standard Edition, even though it allegedly had hundreds of copies of the program on its computers. Meanwhile, it had thousands of licenses for components of the Multi-Host suite, but no copies of that software anywhere on its computers. To any reasonable person acting in good faith, these facts would indicate that the hospital had, in fact, purchased licenses for all of the software it deployed.

32.     But Attachmate's compliance personnel did not adopt or even suggest this commonsense conclusion.

F.     Attachmate Incentivized Its Compliance Staff To Overlook The Facts And To Make Outlandish Claims.

33.     Attachmate's continued insistence on extracting payment from the Hospital stands to reason. For several years, Attachmate has been engaged in a litigation campaign around the country and the world against institutions it accuses of overdeploying its software.

34.     On information and belief, this litigation campaign is driven by Attachmate's compliance staff, who receive substantial bonuses based on the revenue their work generates for Attachmate.

35.     Attachmate thus gives its compliance staff incentives to take positions not supported by the facts, as they have done in this case.

36.     Attachmate's compensation system, and its practice of charging 12% interest on claimed overdeployments, gives its compliance staff incentives to delay audits for years, as they did in this case, to increase their compensation.

Count One
Declaratory Judgment—Non-Infringement of Copyright

37.     The Hospital incorporates the allegations of paragraphs 1 to 36, above.

38.     Attachmate has accused the Hospital of infringing Attachmate's copyrights, including Reflection for Multi-Host Enterprise, which is unregistered, and Reflection for UNIX and Digital, version 8.0 (Copyright Registration No. TX5-104-607), which was registered on April 28, 2000, among others.

39.     The Hospital denies Attachmate's allegations of infringement. As alleged above, the Hospital purchased thousands of licenses for Reflection software that was part of the Multi-Host Enterprise suite, and paid thousands of dollars for the right to receive new releases of Reflection for UNIX and other programs. The Hospital was fully licensed to use and deploy Attachmate's software as it did.

40.     Alternatively, Attachmate waived any claim against the Hospital for copyright infringement by licensing the software to the Hospital. Thus, Attachmate's only claim, if any, is for breach of contract—not copyright infringement.

41.      Alternatively, Attachmate's copyright infringement claim is barred by the statute of limitations of the Copyright Act, 17 U.S.C. § 507(b). Attachmate always had a right of audit and it knew or should have known of any claim arising from unlicensed copies of its software on Hospital computers no later than 2006, when it was no longer invoicing the Hospital for any product, license, or service associated with Reflection.

42.     Alternatively, Attachmate's copyright infringement claim is barred by waiver, estoppel, laches, or acquiescence. Attachmate unreasonably and intentionally delayed asserting its purported claims for copyright infringement, and waited more than nine years after the Hospital stopped using Reflection to conduct its first compliance audit.

43.     There exists an actual and justiciable controversy between the parties, and the Hospital is entitled to a declaration that it did not infringe any of Attachmate's copyrights.

Count Two
Declaratory Judgment—No Breach of Contract

44.     The Hospital incorporates the allegations of paragraphs 1 to 43, above.

45.     Attachmate has accused the Hospital of breaching the licensing agreements governing its use of the Reflection software.

46.     The Hospital denies Attachmate's claim for breach of contract. Not only has Attachmate failed to identify the contracts that were allegedly breached, but its allegations arise solely from its own failure to maintain complete records of the Hospital's licenses, or to account for and deliver correct versions of the licensed software to the Hospital, or to conduct a timely and accurate audit of the Hospital's licensing compliance.

47.     Alternatively, Attachmate's breach-of-contract claim is barred by the applicable statute of limitations, either Mass. Gen. Laws c. 260, § 2 or Was. Rev. Code § 4.16.060. Attachmate knew or should have known of any claim for breach of the licenses governing the Hospital's use of Reflection no later than 2006, when Attachmate stopped invoicing the Hospital for any product, license, or service associated with Reflection.

48.     Alternatively, Attachmate's breach-of-contract claim is barred by waiver, estoppel, laches, or acquiescence, or failure to mitigate damages. Attachmate unreasonably and intentionally delayed asserting its purported claims for breach of the licenses concerning its Reflection software, and waited more than nine years after the Hospital stopped using Reflection to conduct its first compliance audit.

49.     Alternatively, Attachmate's breach-of-contract claim is barred for lack of damages.

50.     There exists an actual and justiciable controversy between the parties, and the Hospital is entitled to a declaration that it did not breach any contract it had with Attachmate.

10

Count Three
Violation of Gen. Laws c. 93A

51.     The Hospital incorporates the allegations of paragraphs 1 to 50, above.

52.     Attachmate is engaged in trade or commerce within the meaning of Mass. Gen.

Laws c. 93A, § 11.

53.     On information and belief, Attachmate's current business model intentionally

exploits its own failures of record-keeping and the routine destruction of historical business

records by its current and former customers to extract exorbitant software licensing fees from

those customers based on unsupported allegations of copyright infringement and breach of

contract.

54.     On information and belief, Attachmate hires employees assigned to "license

compliance teams" who are compensated in part based on (1) the amount of money they

convince customers to pay for purportedly unlicensed versions of old Attachmate software

discovered during a "compliance audit," and (2) the amount of time that passes from when a

customer initially purchases Attachmate software to when a compliance audit is first performed,

thus maximizing both the potential for inadvertent unlicensed use and the loss of business

records necessary to refute Attachmate's interpretation of audit data.

55.     Here, Attachmate waited nearly ten years after the Hospital stopped maintaining

its thousands of licenses for Reflection software to conduct an audit, and has now demanded the

Hospital pay $925,000 for purportedly unlicensed versions of Reflection for Multi-Host

Enterprise Edition, despite the thousands of licenses the Hospital purchased for Reflection for

UNIX, which is part of the Reflection for Multi-Host product suite.

56.     Attachmate's intent to delay is evidenced in part by its demand that the Hospital

pay 15 years of interest at the statutory rate of 12%.

57.     On information and belief, Attachmate has employed a similar approach with many of its current and former customers; it specifically incentivizes its employees to accuse customers of infringement, irrespective of the good-faith basis for such accusations, and to make exorbitant settlement demands, irrespective of whether the demand bears any relationship to a good-faith allegation of harm.

58.     The center of gravity of the circumstances giving rise to the Hospital's claim is primarily and substantially within the Commonwealth of Massachusetts, where Attachmate delivered its software in the early 2000s, where the purported compliance audit was conducted, and where Attachmate directed its unreasonable demands.

59.     Attachmate's conduct as alleged above is unfair and deceptive within the meaning of Gen. Laws c. 93A, § 11.

60.     As a result of Attachmate's misconduct, the Hospital has been damaged in an amount to be determined at trial.

<u>DEMAND FOR RELIEF</u>

Therefore, the plaintiff demands:

1.     A declaration that it has not infringed the defendant's copyrights;

2.     A declaration that it has not breached the terms of any applicable license agreement between the parties;

3.     A declaration that Attachmate's claims for copyright infringement and breach of contract are barred by the applicable statute of limitations;

4.     A declaration that Attachmate's claims are otherwise barred by the doctrines of waiver, estoppel, laches, and acquiescence;

5.     Damages in an amount to be determined at trial, and multiple damages under G.L. c. 93A, § 11;

6.      Its costs, interest, and its reasonable attorney's fees; and

7.      Such other relief to which it may be entitled at law or in equity.

<u>DEMAND FOR JURY TRIAL</u>

The plaintiff demands a jury trial.

                                        Respectfully submitted,

                                        CHILDREN'S HOSPITAL CORP. D/B/A
                                        BOSTON CHILDREN'S HOSPITAL,

                                        By its attorneys:

                                        /s/ Theodore J. Folkman
                                        Theodore J. Folkman (BBO No. 647642)
                                        Steven M. Veenema (BBO No. 672097)
                                        MURPHY & KING, P.C.
                                        One Beacon St.
                                        Boston, Mass. 02108
                                        (617) 423-0400
                                        tfolkman@murphyking.com
                                        sveenema@murphyking.com

Dated: July 14, 2015

691772